1      IN the UNITED STATES DISTRICT COURT
      FOR the WESTERN DISTRICT OF PENNSYLVANIA

2

3

UNITED STATES OF AMERICA

4      PLAINTIFF

5

    VS.        CRIMINAL NO. 05-19 Erie

6

MELISSA HICKS,

7      DEFENDANT

8

9

10      PROCEEDINGS - REDACTED
    Transcript of HEARING ON SENTENCING, commencing on
11  TUESDAY, AUGUST 23, 2006, 3:00 P.M., in the United States
District Court, U.S. Courthouse, Erie, Pennsylvania, before
12  the HONORABLE MAURICE B. COHILL, JR., UNITED STATES SENIOR
DISTRICT JUDGE.

13

APPEARANCES:

14

For the Government: By: Brendan Conway, Esquire
15      Assistant U.S. Attorney
      Office of the U.S. Attorney
16      Fourth Floor, U.S. Courthouse
      Pittsburgh, Pennsylvania  15219

17

For the Defendant: By:  Thomas Patton, Esquire
18      Assistant Federal Public Defender
      Office of the Federal
19      Public Defender

1450 Liberty Center
20                    1001 Liberty Avenue
Pittsburgh, Pennsylvania  15222
21                    (Defendant present with counsel.)


22   Reported by:       Sandra Wenger, Official Court Reporter
1017B U. S. Courthouse
23                    Pittsburgh, Pennsylvania  15219
412.261.6254
24
Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.



2



1
            I N D E X

2
                - - -

3
WITNESS           DIRECT   CROSS   REDIRECT   RECROSS

4
D. ANDERCHAK          6     23       39       --

5


6


7


8
                - - -

9
            I N D E X

10
                - - -

11
EXHIBITS                OFFERED   ADMITTED

12
GOVERNMENT EXHIBIT 1          7        7

13

   GOVERNMENT EXHIBIT 13          13        13

14

   GOVERNMENT EXHIBITS 14, 15,

15    16, 17, 18, AND 19            14        14


16   GOVERNMENT EXHIBITS 21, 22, 23   16       16


17   GOVERNMENT EXHIBITS 2, 3, 4,

    AND 5                    18        18

18

   GOVERNMENT EXHIBIT 9, 9-A        20      20

19

   GOVERNMENT EXHIBITS 10 AND 11    21      21

20

   GOVERNMENT EXHIBIT 12           22      22

21


22   DEFENDANT EXHIBIT A            30      30


23


24               - - -


25

3


1     TUESDAY AFTERNOON SESSION, AUGUST 23, 2006, 3:00 P.M.


2                 - - -


3          THE COURT:  Good afternoon.  Be seated, please.


4          This is the time set for the sentencing of Melissa


5   Hicks.  Judge Mclaughlin of this Court previously had taken


6   her guilty plea in this case.  I have been assigned to do the

7   sentencing.

8           We note that Miss Hicks and her attorney have

9   signed the notice indicating they have received and reviewed

10  the presentence report.  We'll make that part of the record

11  under seal.

12          If an appeal should be taken, of course, counsel

13  will be permitted access to that report.

14          There's been no information withheld from the

15  defendant which was given to the Court.

16          The Supreme Court in a case called United States

17  against Booker, in January of 2005, rendered an opinion which

18  said the Sentencing Guidelines are no longer mandatory, but

19  they are advisory.  And the Court is still obligated to

20  consult with them in determining the imposition of a

21  reasonable sentence.  So, we have done that in this case.

22          The government has not filed objections to the

23  presentence report.  The defendant has filed objections.  And

24  we note that the probation officer has indicated agreement

25  with two of the defendant's objections.

4

1      First, the two-level increase applied pursuant to

2  Sentencing Guideline Section 2B1.1(b)(10)(C)(ii), at

3  paragraph 30, is in error.  So, the adjusted offense level

4  should be reduced from 14 to 12.

5      And, with that two-level reduction for acceptance

6  of responsibility, the probation officer indicates that the

7  initial total offense level should be a 10.  This change also

8  affects the advisory Guideline and fine range.

9      Second, the Probation Office notes that the

10  defendant is correct, that the offense contained in

11  paragraph 64 is related to the offense at paragraph 65.  And,

12  thus, no criminal history point should be assigned for the

13  offense at paragraph 64.  This does not change the

14  defendant's criminal history category.

15      In addition, the Probation Office notes two typo-

16  graphical errors in paragraph 59, as indicated, and corrected

17  in the addendum to the presentence report.

18      The defendant's remaining objection is to the total

19  amount of loss of $40,407.10 is incorrect because three of

20  the checks to determine that amount should not be included,

21  since there is no evidence linking the defendant to those

22  checks.  The defendant does admit that the total amount of

23  loss should be $22,393.64, which would result in a four-level

24  increase instead of a six-level increase, calculated on the

25  higher loss amount at paragraph 29.

5

1        So, I guess the thing to do, at this point, would

2   be to hear argument with respect to the computation of that

3   $18,000 discrepancy, between forty and twenty-two.

4        MR. CONWAY:  That would be correct, Your Honor.

5   And we intend to present evidence of the linkage and we do

6   also continue to assert that the two-level increase, pursuant

7   -- that the Probation Office was originally correct when they

8   calculated the two-level increase, pursuant to

9   2B1.1(b)(10)(C)(ii), in that the means of identification in

10   this case were, that were used in connection with the crime

11   were produced were illegitimate and unauthorized.  She got,

12   she got driver's licenses from unauthorized driver's

13   licenses.  They were stolen and then somehow applied to her.

14        And they were then altered.  The means of

15  identification was altered and, thus, a new means of

16  identification was produced that was used in connection with

17  the crime.

18        So, we do assert that the Probation Office was

19  originally correct when they increased the offense level by

20  two levels.  And you will see that.

21        I intend to present evidence of how the driver's

22  licenses were altered and how they were used in connection

23  with the crime.  So, we do assert to that two-level

24  enhancement applies.

25        We also still have the upward departure motion --

6

1  not motion, but the notice from the Probation Office about

2  the upward departure.  We certainly view is an issue, as well

3  as in this sentencing.  But, in terms of the evidence, Your

4  Honor, the government would present testimony from Postal

5  Inspector David Anderchak.

6        THE COURT:  Step forward, Inspector Anderchak.

7        DAVID ANDERCHAK, A WITNESS, having been first duly

8  sworn, was examined and testified as follows:

9        THE COURT:  Have a seat up here, please?  Give us

10  your name and spell your last name?

11        The WITNESS:  My name is David Anderchak,

12  A-N-D-E-R-C-H-A-K.

13        THE COURT:  Mr. Conway.

14            DIRECT EXAMINATION

15  BY MR. CONWAY:

16  Q    Sir, you were the case agent that led to the indictment

17  and guilty plea of Miss Hicks; is that correct?

18  A    Yes, sir.

19  Q    And in connection with that, did you prepare a spread

20  sheet of the loss calculation in this case?

21  A    Yes, I did.

22        MR. CONWAY:  And that is, Your Honor, I have

23  provided your clerk with a group of exhibits, as well as

24  defense counsel and the Postal inspector has them, as well.

25  BY MR. CONWAY:

7

1  Q    Is that Government Exhibit 1?

2  A   Yes, sir it is.

3       MR. CONWAY:  Your Honor, I would move for admission

4  of Government Exhibit 1.

5       THE COURT:  Exhibit 1's admitted.

6       (Whereupon, Government Exhibit 1 offered and

7  admitted in evidence.)

8       MR. CONWAY:  Request permission to display, Your

9  Honor.

10       THE COURT:  I don't know if this one's working.  I

11  have the chart.

12       Wait.  Is it showing now?  It's not showing.

13       It just came on now.

14       MR. CONWAY:  We can start without the electronics,

15  I believe.

16       THE DEPUTY CLERK:  There, it is.

17       THE COURT:  All right.

18       MR. CONWAY:  And I think counsel and I can agree

19  that the issue with regard to the loss really boils down to

20  these Eldora Harris checks, because that, that's going to

21  push it over $30,000, if those are included.  The other, the

22  other ones are relatively minor checks.

23  BY MR. CONWAY:

24  Q    But, so, let's focus, if you would, Inspector Anderchak,

25  on the Eldora Harris checks.  There are, perhaps, ten or so

8

1  of them listed on your spread sheet; is that correct?

2  A    That's correct; yes.

3  Q    And the person right above that is Nevada Green; is that

4  correct?

5  A    Yes, it is.

6  Q    Now, how does the name Nevada Green, the checks listed

7  there, how were those connected to Miss Hicks?

8  A    They were connected -- Nevada Green was an individual

9  that was a victim of her Pennsylvania driver's license

10  identification card was stolen.  Misplaced.  And counterfeit

11  checks were issued using that name.

12  Q    And Miss Hicks admitted in the confession to police,

13  when she was initially arrested, that she had used the Nevada

14  Green name; correct?

15  A    Correct.  She was arrested and, actually, identified

16  herself as Nevada Green.

17  Q    Now, in addition, she is, also, in the course of this,

18  she has admitted her involvement with respect to the Stacey

19  Childs checks; is that correct?

20  A    That's correct.

21  Q    Now, if we go down to the very bottom, there are a

22  number of checks, two of them, listed in the name of Alvin

23  Taylor.  And she was arrested with Mr. Taylor at the, at the

24  Grove City Mall; is that correct?

25  A    No, sir.  It was Mill Creek.

9

1  Q    Mill Creek.  And she was using, at that time, the name

2  Estelle Ramy; is that correct?

3  A    Yes, it is.

4  Q    Now, when you -- during the course of the investigation,

5  these ones where she's admitted or been arrested with, in

6  comparing them to the Eldora Harris checks, did you notice

7  any similarities between those checks where she's admitted or

8  was arrested and the Eldora Harris checks?

9  A    Yes, we did.

10  Q    Let's just go through a few of them.  For example, if we

11   just look at Nevada Green?   Those checks appear to be

12   passed, and almost all of them, in the mid-July time frame;

13   is that correct?

14   A   Yes, sir.

15   Q   Eldora Harris's checks, basically, in that time frame

16   and a little bit later; is that correct?

17   A   Yes, sir; it is.

18   Q   Did you note any similarities between the locations

19   where the Nevada Harris and Stacey Childs checks were passed

20   and the Eldora Harris checks were passed?

21   A   Yes, sir.

22   Q   Can you go through some of those similarities with the

23   Court?

24   A   Yes, sir.  The Stacey Childs, Nevada Green, Eldora

25   Harris checks, theyre similar in that in the same -- some of

10

1   them actually have the same locations.  For instance, the

2   Wal-Mart in Butler.  It's the same location that the Harris

3   checks were passed, as were the, for instance, Nevada Green

4    was also passed at the Wal-Mart in Butler.

5        That is the location where Miss Hicks was arrested and

6    told the officers that her name was Nevada Green.

7    Q    So, for example, if I underline this one, that's at

8    Wal-Mart with Nevada Green on 7/19 of 2004; is that correct?

9    A    That's correct.

10    Q    And that that is the Wal-Mart in Butler; is that

11    correct?

12    A    Yes.  That's correct.

13    Q    If we go down a few?  7/19, Eldora Harris, also in

14    Butler; is that correct?

15    A    Yes, sir.

16    Q    And there's also similarities between Zales and Lowe's?

17    Similarities; is that correct?

18    A    That's correct.

19    Q    Another similarity is the issuing, purported issuing

20    bank; is that correct?

21    A    Yes, it is.

22    Q    Now, with regard to Eldora Harris.  All of them are Iron

23    and Glass Bank, except -- no.  All of them are; is that

24    correct?

25    A    That is correct; yes.

11

1  Q    Now, did Iron and Glass Bank also come up with the

2  Nevada Green and the Stacey Childs checks?

3  A    Yes, sir; they did.

4  Q    Also, if we go down to the Joyce Hunt?  Is that passed

5  at the very same Wal-Mart that we had the Green checks and

6  the Harris checks passed at?

7  A    Yes, sir.

8  Q    Now, I guess, go over to this far right-hand column.

9  You had the telephone numbers on there.  What does the

10  telephone number on the far right-hand column of this spread

11  sheet indicate?

12  A    The far right-hand column indicates the phone number

13  that she -- that's used in the upper left-hand corner of the

14  counterfeit checks that are passed.

15      In this case, I was forced to deal with Surogy (Spelled

16  phonetically.) and TeleCheck.  They both are check

17  verification companies.  They verify checks at retail

18  establishments.  Basically, running the account and routing

19   number to make sure it's good.  They have numerous offices

20   throughout the country and investigators that deal with this

21   stuff, and they group the common features of checks.

22        In this case, we were able to identify, based on Miss

23   Hicks being arrested as Nevada Green, using the Nevada Green

24   identity.  The checks that were issued to Nevada Green had

25   the telephone number 4-1-2-2-4-2-4-7-6-7.

12

1        They, also, that number also appears on the Stacey

2    Childs' checks, which Miss Hicks was caught on video tape

3    using.

4        And, from that, we were also able to gather these Eldora

5    Harris checks, which had the same phone number.  And, like we

6    said earlier, were from the same Wal-Mart that had issued the

7    complaints based on counterfeit checks being passed.

8    Q   Now, it's fair to say that we're not alleging that

9    Miss Hicks actually passed the Eldora Harris checks; is that

10   correct?

11   A   No, sir.

12   Q   We don't -- you know our evidence does not indicate that

13  she was the one that was passing them; is that correct?

14  A   Not at this point; correct.

15  Q   We're just suggesting that this evidence indicates that

16  there is a link between Miss Hicks and whoever was passing

17  them, whether it be Miss Hicks or someone else?

18  A   Correct.

19  Q   Now, in addition to that evidence, did we also note a

20  commonality with the modus operandi with the ways the

21  identification cards were altered in the -- for example, in

22  the Nevada Green and also with the Eldora Harris?

23      Why don't you summarize that evidence for His Honor?

24  A   Basically, in this situation, the Pennsylvania driver's

25  license or identification cards were used.  When they were

13

1  presented, there was slight alterations in the driver's

2  license number.

3      For example, a three on a Pennsylvania driver's license,

4  containing the letter or the number three, may have been

5  changed to an eight, with a black marker pen.  Something

6    along those lines.

7        When she was arrested in Mill Creek, the police officers

8    obtained numerous identification cards in her possession and,

9    without looking at them, off the top of my head, almost all

10    of them, almost all of them, the numbers were altered the

11    same way.

12    Q    So, for example, if you could pull out Government

13    Exhibit 13?

14        If you could, actually, 13 through 19.

15        I am sorry.  Thirteen through twenty-three.  We'll go

16    through them quickly.  If you want to provide those to Your

17    Honor?

18        And Government Exhibit 13 is what, sir?

19    A    Government Exhibit 13 is the Pennsylvania driver's

20    license of our victim, which one victim in this case is

21    Nevada Green.

22        MR. CONWAY:  Your Honor, move for admission of

23    Government Exhibit 13.

24        THE COURT:  Thirteen is admitted.

25        (Whereupon, Government Exhibit 13 offered and

14

1  admitted in evidence.)

2  BY MR. CONWAY:

3  Q   In the top, driver's license number 2-2-1-6-9-9-2-0; is

4  that correct?

5  A   That is correct.

6  Q   I'm going to have you go through -- I'm going to ask you

7  to look at Government Exhibits 14, 15, 16, 17, 18, and 19.

8  Are those all the checks that are, well, some of the Nevada

9  Green checks that were listed on your spread sheet already?

10  A   Correct.

11        MR. CONWAY:  Your Honor, I move for admission

12  Government's Exhibits 14 through 19.

13        THE COURT:  Fourteen through nineteen are admitted.

14        (Whereupon, Government Exhibit 14, 15, 16, 17, 18,

15  and 19 offered and admitted in evidence.)

16  BY MR. CONWAY:

17  Q   Now, if we look at Government Exhibit 14?  And often,

18  what happens is the driver's license numbers are actually

19  written down on the top of, in this case, the top center of

20  the check, which is the third check down on your Government

21  Exhibit 14, Your Honor.

22      What happens is the clerk, typically, writes the

23  driver's license down to demonstrate that they've obtained

24  the driver's license number from the individual who is

25  providing the check; is that correct?

15

1  A    Yes, sir.

2  Q    Now, with regard to Government Exhibit 14, that driver's

3  license number and the actual driver's license number for

4  Nevada Green are the same?

5  A    On this third check, they are.  Yes, sir.

6  Q    Now, in subsequent checks that we have, 15 through 29,

7  the checks all have an altered identification number, in that

8  the six, which is the third -- I mean, the fourth digit of

9  the driver's license number, has been altered from a six to a

10  nine; is that correct?

11  A    It's a six to me; yes.

12  Q    I am sorry.  Six to an eight.  We've seen some of the

13  driver's licenses when there is simply just a little black

14  mark that makes a six an eight; is that correct?

15  A    Absolutely; yes.

16  Q    Now, with regard to Eldora Harris.  I want to show you

17  what has been marked Government Exhibit 20.  What is

18  Government Exhibit 20?

19  A    Excuse me.  Government Exhibit 20 is a West Mifflin

20  police report.

21  Q    And that's of the -- and it references Eldora Harris's

22  driver's license number; is that correct?

23  A    Yes, sir; it does.

24  Q    And that number?

25  A    It's marked under Person No. 3, Eldora Harris.  On the

16

1  right-hand side, the operator's license number.  OLN

2  Q    That's the 2-6-6 number?

3  A    Yes, sir.  It is.

4  Q    Now, we looked at the actual Eldora Harris checks; is

5  that correct?

6  A    Yes, sir.

7  Q    Those are marked as Government's Exhibit 21 through 23;

8   is that correct?

9   A    Yes, sir; it is.

10        MR. CONWAY:  Your Honor, I move for the admission

11  of Government Exhibits 21 through 23?

12        THE WITNESS:  Twenty-three.

13        THE COURT:  Twenty-one through twenty-three are

14  admitted.

15        (Whereupon, Government Exhibits 21, 22, and 23

16  offered and admitted in evidence.)

17  BY MR. CONWAY:

18  Q    Now, the driver's license number there on the Eldora

19  Harris checks, how does it compare to her actual driver's

20  license number?

21  A    On No. 22, for instance, --

22  Q    Yes.

23  A    The last three digits, the correct, legitimate number in

24  her victim's driver's number is 3-0-9.

25        On this check marked No. 22 of Eldora Harris, the last

17

1   three numbers are 8-0-9.  So, it's changed from a three to an

file:///A|/HICKS.TXT

2      eight.

3   Q    That is the same on Exhibits 21 and 23, as well?

4         Twenty-one, it's kind of hard to see.  It's on the

5   bottom, left portion of the check?

6   A    I got it here.  Yes, sir.  That's as well.

7   Q    Now, we also noted some similarities in the timing of

8   some of these transactions; is that correct?

9   A    Yes, it is.

10        MR. CONWAY:  Your Honor, if you could get out

11   Government Exhibits 2 through 5?

12   BY MR. CONWAY:

13   Q    Government Exhibit 2 is a Nevada Green check to Zales;

14   is that correct?

15   A    Yes, sir.  It is.

16   Q    And the Government Exhibit 3 would be the receipt

17   related to that; is that right?

18   A    That's correct.

19   Q    Government Exhibit 4 would be a check, Eldora Harris

20   check, to Kay's Jeweler.

21        Government Exhibit 5 would be the receipt associated

22   with that; is that correct?

23  A    That is correct.  Yes, sir.

24         MR. CONWAY:  Your Honor, I move the admission of

25  Government Exhibits 2 through 5.


                              18


1         THE COURT:  Two through Five are admitted.

2          (Whereupon, Government Exhibits 2, 3, 4, and 5

3  offered and admitted in evidence.)

4  BY MR. CONWAY:

5  Q    Now, with regard to the Zales transaction.  I point out

6  Government Exhibit 3 being a receipt.  Did that indicate the

7  date and time of the transaction?

8  A    Yes, it does.

9  Q    And that is July 19, 2004 at 9:39; is that -- I am

10  sorry.  8:40 or so in the evening; is that correct?

11  A    That's correct.

12  Q    Military time's a little off at the moment.

13       And that was located in Butler; is that correct?

14  A    Yes, sir.

15  Q    So, let's compare that Nevada Green transaction to the

16  Eldora Harris receipt, which is Government Exhibit 5.  And

17  that was also on July 19; is that correct?

18  A   That's correct.

19  Q   And it's about thirty-five minutes or so later?

20  A   Yes, sir.

21  Q   And is this also this copy of this transaction Kay's

22  Jewelers also located in Butler?

23  A   It is in the Clearview Mall; yes.  Which is in Butler.

24  Q   You are referring to Government Exhibit 1 when you gave

25  us that, that answer; is that correct?

19

1  A   Yes, sir.

2  Q   Now, when Miss Hicks was arrested, there was a number of

3  identifications and checks that were found on her person; is

4  that correct?

5  A   Yes, sir.

6  Q   Or in her vehicle; is that correct?

7  A   Correct.

8  Q   Now, those ones, to the extent that they were not

9  passed, were they included in the $40,000 spread sheet that

10   you have provided the Court?

11   A    No, sir.

12   Q    Now, I am, I want to show you what has been marked as

13   Government Exhibit 6.  And, actually, why don't you go ahead

14   and tell us about Government Exhibits 6 through 9, at this

15   point?

16   A    The items on these exhibits, or if you start at No. 6,

17   these are the Pennsylvania identification cards of Estelle

18   Ramy and Alvin Taylor.  These are the two individuals, the

19   two cards that were being used by Miss Hicks and a co-

20   conspirator at the Mill Creek Mall at the night of their

21   arrest.

22   Q    The checks.

23   A    The checks here are on the first exhibit, No. 6, Estelle

24   Ramy, are two of the checks.  They are checks that Miss Hicks

25   was attempting to negotiate at jewelry stores at the Mill

20

1   Creek Mall the night of her arrest.

2        The other checks through Exhibits 8 and 9 are various

3   checks that were found and incident to her arrest that

4    evening.

5    Q    And Government Exhibit 9-A?  What is --?

6    A    9-A is a check written to Shaw's Jewelers in the name of

7    Debra Lee Burrell.  This was provided in that West Mifflin

8    report that we referenced earlier.  It's a counterfeit check

9    that was passed at a Shaw's in their jurisdiction.

10   Q    So, that check had been successfully passed; is that

11   correct?

12   A    Yes, sir.  It had.

13   Q    And if, at all, does that connect to Miss Hicks?

14   A    Debra Lee Burrell, her identification card, I believe,

15   without --

16   Q    Well, if we go to Government Exhibit 9, is there a check

17   from Debra Lee Burrell?

18   A    That's correct.

19   Q    Appears to have a person --

20   A    On Government Exhibit 9, bottom right-hand corner, found

21   on Miss Hicks incident to her arrest that night at the Mill

22   Creek Mall, was a blank Debra Lee Burrell check that has the

23   same information in the top left-hand corner as far as

24   address and telephone number.  Same exact check that was

25  found on her that evening.

21

1  Q    And that was not even included in your spread sheet; is

2  that correct?

3  A    No, sir.  It was not.

4  Q    Now, if you we move on to Government Exhibits 10 and

5  11 --

6          MR. CONWAY:  Did I move the admission of Government

7  9?  I move for admission of Government Exhibit 9-A, at this

8  time, Your Honor?

9          THE COURT:  9, 9-A, I think, I think it already

10  was, but okay.

11          (Whereupon, Government Exhibits 9, 9-A offered and

12  admitted in evidence.)

13  BY MR. CONWAY:

14  Q    Government Exhibits 10 and 11.  Would you explain to His

15  Honor what those are?

16  A    Government Exhibit 10 is a list of the Pennsylvania

17  driver's licenses and/or identification cards that were found

18  incident to Miss Hicks' arrest that evening at Mill Creek.

19    No. 11 is a UPMC card found on her in the name of Karen

20  Murphy and looks like another health card in the name of

21  Raymond Batistle (Spelled phonetically.)  Again, found

22  incident to her arrest that evening.

23        MR. CONWAY:  Your Honor, I moved the admission of

24  Government's Exhibits 10 and 11.

25        THE COURT:  Ten and eleven are admitted.

22

1        (Whereupon, Government Exhibit 10 and 11 offered

2  and admitted in evidence.)

3  BY MR. CONWAY:

4  Q    Now, Government Exhibit 12 is what?

5  A    Government Exhibit 12 is a photocopy of a memorandum of

6  interview that I conducted with an individual named Jamie

7  Chandler.

8        MR. CONWAY:  And, Your Honor, I move admission of

9  Government Exhibit 12.

10        THE COURT:  Twelve's admitted.

11        (Whereupon, Government Exhibit 12 offered and

12    admitted in evidence.)

13    BY MR. CONWAY:

14    Q    Can you just briefly summarize, what were the

15    circumstance of her interview and explain what she told you

16    to Judge Cohill.

17    A    Yes, sir.  Wilkinsburg were notified by Stacey Childs

18    that Miss Childs was a potential victim of identity theft.

19    Had some counterfeit checks that were posting against her.

20        Based on Miss Childs' information, the Wilkinsburg

21    Police were able to obtain some surveillance to test from

22    some transactions of these checks.  They were able to present

23    pictures of the surveillance photos on the Pittsburgh News

24    channel.

25        Miss Chandler came, came forward after seeing herself

23

1    on television in connection with these checks.  She was

2    interviewed by myself and a detective from the Allegheny

3    County and she related that Miss Hicks approached her and

4    asked her, on, approximately, four occasions, to drive her

5    to some retail stores, including this one, which was on the

6  news, to purchase some goods for Miss Hicks.

7      MR. CONWAY:  I have no further question, Your

8  Honor.

9              CROSS-EXAMINATION

10  BY MR. PATTON:

11  Q   Sir, with regard to the Eldora Harris checks?

12  A   Yes.

13  Q   I believe your testimony was, you are not trying to say

14  Ms. Hicks was actually the person that passed the Eldora

15  Harris checks; is that correct?

16  A   Correct.

17  Q   If one of the similarities between -- well, let me back

18  up.  You guys don't know who passed the Eldora Harris checks;

19  correct?

20  A   Correct.

21  Q   But you feel that there are similarities between the

22  Eldora Harris checks and some of the Nevada Green and Stacey

23  Childs checks?

24  A   Yes, sir.

25  Q   One of the similarities that you pointed out was the

24

1   fact that some checks with the name Eldora Harris, Nevada

2   Green, and Stacey Childs, were passed at the Wal-Mart store

3   in Butler; correct?

4   A    Yes, sir.

5   Q    Would it be fair to say that in your investigation in

6   this case involved reviewing a lot of the work that was done

7   by the Pennsylvania State Police and other local law

8   enforcement agencies who had reported to or -- excuse me --

9   investigated reports of bad checks being passed; is that

10  correct?

11  A    Correct.

12  Q    For instance, the TeleCheck would, perhaps, contact a

13  local law enforcement agency, saying they had some bad checks

14  being passed; is that correct?

15  A    That's correct.

16  Q    And, indeed, that happened with regard to the checks

17  being passed at the Wal-Mart in Butler; correct?  That the

18  local barracks of the Pennsylvania State Police were involved

19  in investigating the checks being passed at the Wal-Mart in

20  Butler; correct?

21  A    I believe that one was by the Butler Township Police.

22    But the Butler Pennsylvania State Police also had some

23    instances of bad checks and they may have been investigating

24    the same thing.

25  Q    And a Detective Matthew Peerson (Spelled phonetically.)

25

1    from the Butler Township Police was involved in investigating

2    the bad checks being passed at the Wal-Mart in Butler;

3    correct?

4  A    Yes, sir.

5  Q    And Miss Hicks was actually apprehended and brought back

6    to the Wal-Mart store in Butler after trying to pass some

7    checks in the -- under the name of Yvette Middleton; correct?

8  A    Yes, sir.

9  Q    At that time, she was actually taken to a Wal-Mart

10    store in the presence of a Wal-Mart Security Officer; is that

11    correct?

12  A    I believe that was the case.

13  Q    The security officer believe she was the woman that had

14  passed the Stacey Childs checks and the Nevada Green checks;

15  correct?

16  A    Correct.

17  Q    But they never, the Wal-Mart security people, never

18  alleged that Miss Hicks was the individual who had passed the

19  Eldora Harris checks; correct?

20  A    No.  No.  To my recollection, Butler Township Police

21  were notified prior to the arrest saying Wal-Mart was

22  reporting to the police we are experiencing bad checks.  Here

23  are a list of them which were in that report.

24     It said that I remember there was a couple for Stacey

25  Childs, couple for Nevada Green.  There was Eldora Harris in

26

1  there, as well.

2  Q    Right.  But no one, when Miss Hicks was physically at

3  the Wal-Mart store, after being apprehended, while being

4  caught away from the store, but brought back to the store?

5  A    Right.

6  Q    On the day she had tried to pass some bad checks?

7  A    Yes.

8  Q   Miss Hicks is physically in the store with the police

9  and the Wal-Mart security people; correct?

10  A   To the best of my knowledge.  I wasn't there at this

11  point.  So, I'm getting, I'm getting a report from Peerson.

12  Q   Right.  And you relied on that report in doing your

13  investigation?

14  A   Yes, sir.

15  Q   And according to Peerson's report, no one at Wal-Mart,

16  ever, with Miss Hicks there in front of them, made the claim

17  that Miss Hicks was the person, the individual, who was

18  passing the Eldora Harris checks; correct?

19  A   Correct.  On that evening, they alleged she claimed the

20  checks that happened that evening -- my point is prior to

21  that, Wal-Mart had contacted that same police department

22  about a group of checks which Harris was involved.

23  Q   Right.  But they never said, at that point in time, they

24  weren't reporting to you, the, the police, that this list of

25  checks were being passed and Melissa Hicks is the person

27

file:///A|/HICKS.TXT

1  passing all of them; correct?

2  A    They directed me, originally, with a group of checks;

3  right.

4  Q    Correct?

5  A    Then, that night, they make a phone call that they

6  believe the person passing the checks, including Nevada Green

7  and Stacey Childs, was at the establishment.

8       When they bring them back, you are correct that no one

9  said she also did the Harris, Harris checks.  Is that --?

10  Q    Yes.

11  A    I am trying to follow you, but I apologize if I'm not.

12  Q    When she's at Wal-Mart, has a list of -- general list of

13  bad checks that are coming back from their store.  Names'

14  Stacey Childs, Nevada Green, and Eldora Harris; correct?

15  A    Correct.

16  Q    Correct?

17  A    Correct.

18  Q    At the point when they're initially reporting these

19  checks, they're not attempting to identify the actual person

20  who is passing these bad checks; correct?

21  A    They're reporting they've suffered a loss because of

22  these checks.

23  Q   Correct.  At that point, it's not beyond reporting the

24  fact that they have suffered a loss?

25  A   Correct.

28

1  Q   On the day Miss Hicks is apprehended and brought into

2  the store, with the police and the Wal-Mart security people,

3  the Wal-Mart security people indicate that they think she

4  just tried to pass the checks in the name of Yvette

5  Middleton?  They, also, allege she is the person passing the

6  Stacey Childs and Nevada Green; correct?

7  A   Correct.

8  Q   They do not say, we believe this is the person, that she

9  is the person that is passing the Eldora Harris?

10  A   I can't say yes or no to that.  My recollection was

11  there was a first phone call made to the police, saying, we

12  have suffered these losses.

13      The second phone call was when she came back and they

14  said, hey, based on our first call, we believe that

15  individual is here now and we would like an officer to come

16   over.

17   Q   Then that happened; correct?

18   A   Yes, it did.

19   Q   When the officer is there, the people from Wal-Mart,

20   the Wal-Mart security people think this is the people passing

21   the Stacey Childs and Nevada Green and the Yvette Middleton

22   checks; correct?

23   A   Correct.

24   Q   They do not say, we think this is the person passing the

25   Eldora Harris checks; correct?

29

1   A   I don't know that.

2   Q   Well, let me show you the report.

3   A   Sure.  Thank you.

4   Q   I'm going to give you Detective Peerson of the Butler

5   Township Police department's police report.

6   A   Thank you.

7   Q   Have you take a look at that.

8   A   Stacey Childs, Eldora Harris; okay.

9   Q   Is it accurate that nobody claimed that Miss Hicks had

10   passed the Eldora Harris checks?

11   A   Is it clear?

12   Q   Yes.

13   A   The police report indicates that they believed her to be

14   Nevada Green, from reading from it, from all the other checks

15   being passed at the store.

16   Q   So, they said they think she's Nevada Green?

17   A   Correct.

18   Q   You agree, saying she's Nevada Green?  Does not amount

19   to saying that she is Eldora Harris?

20   A   Correct.

21   Q   And, actually, Detective Peerson attaches photocopies of

22   some of the checks, the bogus checks that were passed at the

23   Wal-Mart store; is that correct?

24   A   This report.  You are correct; yes.

25   Q   At least one of those checks that he attaches is one of

30

1   the checks that purportedly is from Eldora Harris; correct?

2   A   Correct.

3  Q    And underneath that is written that they have yet to I-D

4  person passing Eldora Harris checks?

5  A    That's correct.

6  Q    That was after Detective Peerson had done his

7  investigation into trying to determine who's passing  --  is

8  Miss Hicks passing of counterfeit checks at the Wal-Mart?

9  A    I don't know when that was written.  I can't say it was

10  after, before, during.  I don't know.

11        MR. PATTON:  I move for the admission of

12  Defendant's Exhibit A.

13        THE COURT:  A is admitted.

14        MR. PATTON:  Which is Detective Peerson's police

15  report.

16        THE COURT:  Does the clerk have that?

17        THE DEPUTY CLERK:  No.

18        MR. PATTON:   The witness has it.

19        (Whereupon, Defendant Exhibit A offered and

20  admitted in evidence.)

21  BY MR. PATTON:

22  Q    Inspector, you had talked some about Government's

23  Exhibit 20 which were some police reports from the West

24  Mifflin Police Department; do you recall that?

25  A   Yes, sir.

31

1  Q    You see Government's Exhibit 20 on the screen there?

2  A    Yes, sir.

3  Q    Now, were you personally present when this report was

4  filled out?

5  A    No.

6  Q    The information that's on the form under -- in the space

7  that is for Person 3?  That has a name of Eldora Harris, an

8  address, and some personal identification.  Items like date

9  of birth, age, heighth, weight, things of that nature; is

10  that correct?

11  A    Yes, sir.

12  Q    You weren't the person that put that information on that

13  report; is that correct?

14  A    That's correct.

15  Q    Do you know who put, put that information on that

16  report?

17  A    No, sir.  I don't.

18  Q    Do you know where they got that information?

19  A    I am assuming from the J-Net system.

20  Q    You are assuming it's from the J-Net system?

21  A    Correct.

22  Q    You don't know that?

23  A    No.

24  Q    Now, this indicates that Eldora Harris is the proximate

25  age of forty-nine years old; correct?

32

1  A    Correct.

2  Q    The back of this, of what is the first page of

3  Government's Exhibit 20, would actually be page 2 of the West

4  Mifflin Police Department report, with regard to Eldora

5  Harris; is that correct?

6  A    Correct.

7  Q    And it appears that this investigation was started after

8  someone from TeleCheck, who you have testified about,

9  contacted the West Mifflin Police Department about some

10  checks that purportedly belonged to Eldora Harris being

11  passed and the checks being counterfeit; correct?

12  A   Correct.

13  Q   This indicates that, that the officer who investigated

14  this, Sergeant T. Savage, went to the Zales Store and talked

15  with the manager; is that right?

16  A   Correct.

17  Q   And the manager believed that she could identify the

18  woman who passed the check; is that correct?

19  A   That's correct.

20  Q   She was shown a photo array that included a picture of

21  the real Eldora Harris and indicated that that was not the

22  woman who had passed the check; is that correct?

23  A   That's right.

24  Q   The manager of the store indicated that the woman who

25  passed the check was five-five, one hundred ninety to two

33

1  hundred pounds and about forty-six years of age?

2  A   Correct.

3  Q   And that the woman had a bit of gray hair in the front

4  of her hairline; is that correct?

5   A   That's correct.

6   Q   And where Miss Hicks birth date is 7/13 of 1967?

7   A   Correct.

8   Q   And this, the check was passed in, in July of 2004;

9   correct?

10      Correct?  If you look on the second page, in the first

11  paragraph?

12  A   July 26; yes, sir.

13  Q   And, so, if Miss Hicks' birthday is July 13, 1967, that

14  would have made her thirty-seven years old at the time these

15  checks were passed?

16  A   Correct.

17  Q   Did you ever get a picture of Miss Hicks and go back to

18  the manager here at Zales and show her a picture of Miss

19  Hicks?  If she could identify Miss Hicks and Eldora Harris?

20  A   No, sir.  I did not.

21  Q   Now, is it fair to say Government Exhibit 20, actually,

22  is a group of three separate West Mifflin Police Department

23  reports?

24  A   Yes, sir.

25  Q   And each one of those reports is double-sided?

1    A    Correct.

2    Q    And what we've just been -- the report we have just been

3    referring to is the first page of Government Exhibit 20,

4    which is a front and back-sided copy of a West Mifflin Police

5    Department report?

6    A    Yes, sir.  Yes, sir.

7    Q    I want you to turn to second page of Government

8    Exhibit 20.  And that is a police report regarding some

9    checks passed in the name of a Debra Burrell; correct?

10   A    Yes, sir.

11   Q    You indicated that this was another similarity in that

12   at the time of Miss Hicks' arrest, she had a check in the

13   name of Debra Burrell; is that correct?

14   A    Yes, sir.

15   Q    On the second page of what is the second page of

16   Government Exhibit 20, is there a narrative from Sergeant

17   Savage of his investigation into the passing of these checks?

18   A    Yes, sir.

19   Q    And it indicates what, this was an incident at Shaw's

20  Jewelry Store at Century II Mall?

21  A   Yes.

22  Q   The sergeant spoke with Nora Adams who had witnessed the

23  incident?

24  A   Yes, sir.

25  Q   And dealt with a female that had passed the forged

35

1   check?

2   A   Correct.

3   Q   Miss Adams gives a description of the woman who

4   presented the check; is that correct?

5   A   Yes.

6   Q   So that the woman presenting the check was a black

7   female, in her thirties?  It goes on to say, she was tall and

8   had heavy hips and thighs; is that correct?

9   A   Um-hum.

10  Q   Presentence report indicates she is five foot four

11  inches tall.  Does that sound about right to you?

12  A   Yes.

13  Q   You wouldn't characterize a woman who is five foot four

14  inches tall as being a particularly tall woman; would you?

15  A    Not relative speaking.  No.

16  Q    I would like to go to page three of Government Exhibit

17  20, which would be another West Mifflin Police Department

18  report that, again, deals with Debra Burrell; is that

19  correct?

20  A    Yes, sir.

21  Q    That's, basically, another report that details that same

22  incident at Shaw's Jewelry Story; is that correct?

23  A    Yes, sir.

24  Q    And, again, on the back of page -- of the third page of

25  Government Exhibit 20 is, again, the description.  And this,

36

1  I mean, handwriting.  It appears to the description of the

2  person who passed the check.  It has, early thirties.  The

3  record reads, tall.  The word, tall, underlined; is that

4  correct?

5  A    Yes, sir.

6  Q    Braided hair with a huge ponytail; correct?

7   A    Correct.

8   Q    The description, hips and thighs huge?

9   A    Correct.

10  Q    I want to ask you about Government Exhibit 5.  Now, --

11  A    Have one second to locate it?

12  Q    Sure.

13  A    Yes, sir.

14  Q    All right.  That purports to be a receipt from or a

15  sales slip from where?

16  A    This is from, if you look at Government Exhibit 1,

17  Zales, in the amount of $2,405.  It's from a Kay Jewelers in

18  the Clearview Mall.

19  Q    Could you show me where, on Government Exhibit 5, it

20  states that this is from a Zales Jewelers at the Clearview

21  Mall?

22  A    That's Kay's.

23  Q    Excuse me.  Kay  Jewelers.  I am sorry.

24  A    It's not on the receipt.

25  Q    It's not on the receipt?

37

1  A    That's correct.

2  Q    And, so, how do you know that this came from the Kay's

3  Jewelers at the Clearview Mall?

4  A    This was part of a report created by -- it would have

5  been the Butler State Police in connection with the loss that

6  Kay Jewelers suffered regarding a counterfeit check in the

7  name of Eldora Harris.

8  Q    Could you look at Government Exhibit 5 for me?

9  A    Sure.

10  Q    You see on the second line from the top where it has

11  customer name?

12  A    Yes.

13  Q    What name does it have?

14  A    Eleanor Harris.

15  Q    Does in the have Eldora Harris; correct?

16  A    No, sir.  It does not.

17  Q    And you would agree with me that, as far as Government

18  Exhibit 5 is concerned, when you look at it, by itself, there

19  is nothing on that document that indicates that this sales

20  slip comes from a Kay's Jeweler at the Clearview Mall?

21  A    Correct.

22  Q    And it identifies the person who, the customer name that

23  this sales slip is referring to or associated with as Eleanor

24  Harris?  Correct?

25  A    Yes.  It does.  With similar address as Eldora Harris.


38


1  If you look at Government Exhibit 21?

2  Q    I am sorry.  I don't have a question.

3        MR. PATTON:  May I just have a moment, Your Honor?

4        Those are my questions, Your Honor.

5        I apologize.  I am sorry.  I do have one more

6  question.

7  BY MR. PATTON:

8  Q    With regard to the alleged altered identifications.  You

9  testified some about that; is that correct?

10  A    Yes, sir.

11  Q    Mr. Conde from the Probation Office called you and

12  talked to you about the I-D's that had been found when Miss

13  Hicks had been arrested; is that correct?

14  A    Correct.

15  Q    And he called you to talk about whether or not you had

16   any evidence that those identifications had, had been altered

17   or not; is that correct?

18   A    Yes.

19   Q    And when the Probation Officers spoke to you, you told

20   them that there was no proof that the forms of identification

21   found in possession of the defendant had been unlawfully

22   produced from or obtained by the use of means of another

23   identification; is that correct?

24   A    I told them they were altered.

25   Q    You told them that they were altered?

39

1    A    Altered.

2    Q    You told them that they had not been unlawfully produced

3    or obtained by another means of use of identification; is

4    that what you told them?

5    A    Not in those words.  I never used those words.  I told

6    him they were altered.  They were not produced, per se, from

7    some machine.

8         MR. PATTON:  Those are my questions, Your Honor.

9                    REDIRECT EXAMINATION

10    BY MR. CONWAY:

11    Q    Just going back to Government Exhibit 21.  I think you

12    were about to note the similarity between the address in

13    Government Exhibit 5 and the Eldora Harris address; is that

14    correct?

15    A    Yes, sir.

16    Q    Could you go ahead and make that comparison?

17    A    If you look at Government Exhibit 5, the attorney is

18    correct in that it does say Eleanor Harris.  And if you look

19    at the bottom, it says, 2121 Forbes Avenue, Pittsburgh,

20    Pennsylvania.

21        If you look at Government Exhibit 21, which is a

22    counterfeit Eldora Harris check, 2121 Forbes Avenue,

23    Pittsburgh, Pennsylvania 15219, is the address on that

24    counterfeit check.

25            MR. CONWAY:  Just one moment, Your Honor.

40

1    BY MR. CONWAY:

2    Q    If you go to Government Exhibit 4?  That top check in

3   Government Exhibit 4, was that the actual one associated with

4   the receipt that is Government Exhibit 5?

5          THE COURT:  Give me one second, please.

6          I have a hard time finding No. 4 here.  I got it.

7   I am  sorry.

8          MR. CONWAY:  I can show you a copy.

9          THE COURT:  I am sorry.  I got it.

10  A    Correct.  The top check on Exhibit 4 references the

11  receipt on No. 5.  And, again, the address is 2121 Forbes

12  Avenue, Pittsburgh, Pennsylvania 15219.  With the telephone

13  4-1-2-2-4-2-4-7-6-7.

14         MR. CONWAY:  I have no further questions.

15         MR. PATTON:  I have nothing further.

16         (Whereupon, the witness was excused from the

17  witness stand.)

18         MR. CONWAY:  And I have no further evidence to

19  present, Your Honor.

20         (Whereupon, Government rests.)

21         MR. PATTON:  Your Honor, we have no evidence to

22  present.

23         (Whereupon, the Defendant rests.)

24          THE COURT:  Very well.

25          MR. PATTON:  Have some argument.

41

1          THE COURT:  I am sorry?

2          MR. PATTON:   I said, I have some argument on the

3  loss.

4          THE COURT:  Right.  I would like to hear that.

5          MR. PATTON:   I don't know if it's the government

6  burden?

7          MR. CONWAY:  With regard to the loss, Your Honor,

8  we do believe we have met our burden here in establishing,

9  again, we don't know who passed these checks.  We're not

10  alleging that she did it.  All's required proof is that she

11  was part of some sort of conspiracy and these checks were,

12  were involved in that conspiracy.  We, certainly, met that

13  burden of proof.

14          And I think the most obvious factor is the, is the

15  telephone number, the exact same telephone number on checks

16  that she admitted she passed, she admitted she was involved

17  with somehow by, I guess, Divine Providence, according to the

18  defense. That telephone number is exactly the same telephone

19  number on the Eldora Harris checks. That is a coincidence

20  that has no explanation, other than a commonality in a

21  conspiracy.

22       You add that to the time frame of the passage of

23  the checks. These are all in mid-July to mid-August. You

24  add the places, the similarities of the places, the Butler

25  Wal-Mart, the Zales Store, Lowe's Store, spread sheets, and

42

1  the timing of these things, it's clear that there's a group

2  of people going from store, to store, to store, passing these

3  types of checks.

4       You look at the time frame of the example we

5  brought out, when, where they were going from one jewelry to

6  another jewelry store. Nevada Green. Forty minutes later,

7  Eldora Harris in the same area. That's awfully -- you add

8  that to the telephone number and then you add that to another

9  coincidence, I guess, of Divine Providence was involved with

10  that, as well.

11          That's just not a reasonable explanation.  The

12  reasonable explanation is consistent with the evidence, that

13  people were involved in a conspiracy.  The real icing on the

14  cake with regard to that is the use of the identification

15  cards, the altering of the numbers associated with them.

16          You take a number, a three.  You change to it an

17  eight.  A six, you change to it an eight.  A fairly unique

18  situation in terms of the use of changing those IDs, using

19  Eldora Harris, using the Nevada Green.

20          What did we find when Miss Hicks is arrested?  We

21  find, literally, a slew of IDs.  If you take a look at these

22  in any detail, you will see that many of them are altered

23  with a little line that we've talked about.  I think there is

24  probably about fifteen of these IDs in here.  Many of them,

25  if you look at it with any degree of care, you will see that


43


1  there is, there is a little mark on some of them that changed

2  the number, making a six an eight, a three a six.  Similar

3  situations to that.

4          So, we have just a -- when you add these things up,

5   you just have a confluence of circumstances, and the only

6   explanation is a conspiracy.

7        And Miss Chandler, also, has the cherry on top of

8   the icing with regard to that, because she testified, or she

9   didn't testify, but she provided a statement which described

10   what was going on here.  Miss Hicks would recruit people to

11   pass checks.  She would then drive them around, have them

12   cash checks, and then she would get the merchandise.

13        And that's what she's been doing her whole life.

14   I mean, look at her criminal history.  I mean, this is

15   someone from, from the tender age of eighteen or so has just

16   been committing crime after crime for her entire adult life.

17   These same types of offenses.

18        Now, you put all of that together, Chandler, the

19   circumstances here, the altered IDs, her criminal history,

20   there is just simply no question that we have met our burden

21   with regard to a preponderance of the evidence.

22        With regard to her connection to Eldora Harris and

23   the other individuals involved here, that's my argument with

24   regard to loss.  With regard to altering the IDs, that is

25   really a statutory interpretation question.  What we've

1  clearly established is that Miss Harris, without the

2  authority of -- let me go back to the loss amount for a

3  moment, Your Honor.

4         With regard to establishing, certainly, within the

5  thirty to seventy thousand dollar range, we haven't included

6  all the things we could have included in the spread sheet.

7  We've got multiple blank checks here that we found on her

8  person that we could have assigned a random value to add it

9  to the loss figure.

10        We've got the Burrell check, the twenty-four

11  hundred Burrell check that we didn't add to the spread sheet

12  to establish that we're between thirty and seventy.

13        I don't think there is any question, even if Eldora

14  Harris we're to take her out to establish the other eight

15  thousand, to get us from twenty-two to thirty, with those

16  other blank checks and the other things that were going on

17  here, clearly, the appropriate range here is thirty to

18  seventy thousand dollars worth of loss.  I think even that is

19  conservative with regard to the blank checks that we have.

20          With regard to the altering identifications.

21    Clearly here, were unauthorized identifications that were

22    part of this offense.  Miss Harris, I mean, Miss Hicks had

23    Nevada Green identification, for example.  And there was

24    there was an unauthorized possession of that.

25          She then created another means of identification,

45

1    which is, essentially, that same ID with an altered driver's

2    license number.  The driver's license number is another

3    quote/unquote means of identification under federal law.

4          So, what you have done is you have used, I got one

5    unauthorized ID.   You use that to create another

6    unauthorized access device or, in this case, the Pennsylvania

7    driver's license.  That's part of the offense.  I, therefore,

8    I think the Probation Office, initially, is correct when they

9    applied this enhancement.  So, that's my argument with

10   regard, with regard to the loss, Your Honor.

11          With regard, and with regard to this enhancement.

12   However you rule on this, you know, we're in a little bit

13   freer reign than we used to have with regard to what the

14   appropriate sentence ought to be.  However you rule on these

15   things, it's contrary that a substantial term of imprisonment

16   isn't appropriate for Miss Hicks.

17        We have -- if I extrapolate it out, and in criminal

18   history category VI, but if we extrapolate out and what her

19   criminal history category, if it continued, it would be a 14.

20        A 14 criminal history category, an absolutely

21   incredible criminal history, and what happens every time she

22   comes before a Court, a little slap on the wrist.  That's

23   what happened her entire life and that's why she keeps doing

24   it, because she doesn't face the punishment she ought to face

25   in this Court and in the Courts that she's been before.

46

1        Your Honor, I believe that anything less than a

2   four-year sentence in this case is completely inappropriate.

3   We have somebody here who has an incredible criminal history,

4   someone we can't rehabilitate, we can't fix her.

5        Look at this criminal history.  Thirty-six

6   something criminal history points.  Many of them don't even

7    count.  Many of them were zeros, if you look at this thing.

8    We can rehabilitate, but here we need to protect society from

9    her criminal conduct, and that, the people of the Western

10   District of Pennsylvania, after thirty-eight convictions,

11   however many she had, are entitled to that protection.

12       Thank you.

13       THE COURT:  Mr. Patton.

14       MR. PATTON:  Judge, I'll start with the amount of

15   the loss.

16       Since the government has admitted that they have no

17   evidence that Miss Hicks is the person that actually passed

18   the Eldora Harris checks, the only way under the Sentencing

19   Guidelines Miss Hicks could be accountable for those checks

20   would be under the guise of relevant conduct.

21       However, to be held accountable under relevant

22   conduct for actions of others, the government would have to

23   prove that this was a case of jointly undertaking criminal

24   activity.  Criminal scheme, endeavor, or enterprise,

25   undertaken by the defendant, in concert with others, whether

47

file:///A|/HICKS.TXT

1    or not charged in the conspiracy, all reasonably foreseeable

2    acts and omissions of others in furtherance of the jointly

3    undertaking criminal activity that occurred during the

4    commission of the offense of conviction, in preparation for

5    that offense, or in the course of attempting to avoid

6    detection or responsibility for that offense.  U.S.

7    Sentencing Section 1B1.3.

8         The only conspiracy that was alleged here was,

9    that Miss Hicks pled guilty to, was conspiring with Mr. Alvin

10   Taylor with regard to the incidents that happened at the Mill

11   Creek Mall.

12        With regard to all of these other checks, the

13   Stacey Childs checks, Nevada Green, and the Eldora Harris

14   checks, there was no charge of conspiracy.  And, indeed,

15   other than Mr. Conway's argument here today, there's no

16   evidence that Miss Hicks engaged in any kind of jointly

17   undertaking criminal activity with the person who actually

18   passed the Eldora Harris checks.

19        That, that's what they have to prove to you.  If

20   they've admitted that it's not Miss Hicks that actually

21   passed the checks, once they admit that, then they have to

22   prove that Miss Hicks actually was engaged in a jointly

23   undertaking criminal activity with the individual who passed

24   the checks.

25          Now, to try and meet that burden, the government

48

1   has said, well, the same phone number's on the checks.  Well,

2   we agree that with respect to sentencing factors, there is

3   actually a very obvious and easy explanation of that.  The

4   person who manufactures the counterfeit checks has control

5   over what number, what telephone number is going to get put

6   on there.  And that's the person that decides what address is

7   going to go on there and what telephone number is going to be

8   used.

9          There is no allegation that Miss Hicks was the

10  actual person who manufactured the checks.  So, all this

11  shows is that the same person that manufactured some of the

12  checks, that Miss Hicks did pass, probably manufactured the

13  checks that -- whoever it is that passed the Eldora Harris

14  checks.

15          Now, the only evidence that they presented to you

16  with regard to a police report detailing a check passed by

17  Eldora Harris is Government Exhibit 20.  The first page of

18  that is a West Mifflin Police Department report detailing

19  someone using the name of Eldora Harris passing a counterfeit

20  check at a Zales Jewelry Store at Century III Mall.

21          The manager of that Zales store said that the

22  person who passed the Eldora Harris check was about forty-six

23  years of age and that the woman had a bit of gray hair in the

24  front of her hairline.

25          Well, at the time this incident occurred, Miss

49

1  Hicks was thirty-seven years old.  So, she was off by nine

2  years, if it was Miss Hicks, which, obviously, it's not.  And

3  Miss Hicks, obviously, doesn't have any gray hair in the

4  front of her hairline.

5          To the extent they wanted to try and say, well,

6  there's similarity between Miss Hicks and Miss Burrell, we

7  found checks with -- in the name of Burrell in Miss Hicks'

8  possession at the time she was arrested.  If you look at

9   Government's Exhibit 10, the checks that I have, that have a

10  last name of Burrell, are, actually, I, I believe it's

11  Government Exhibit 9.  Or 7.  It's Government Exhibit 9.

12  Lower right-hand of that Exhibit 9 has Debra Lee Burrell,

13  with Debra spelled D-E-B-R-A, Debra Lee Burrell.  If you look

14  at Government Exhibit 20, the name on the police reports have

15  it as being Debora, D-E-B-O-R-A, Burrell.

16          The address of the West Mifflin police report for

17  Debra Burrell is, again, this is the second page of

18  Government Exhibit 20, is 226 and a half Glenn Caladh Street

19  in Pittsburgh.

20          On Government Exhibit 9, it does have the same

21  address.  But, when you look at the description of the woman

22  who passed those checks, the one I think it says is the woman

23  is tall and has huge hips and huge thighs.  Well, Miss Hicks

24  is five foot four inches tall and under no circumstances

25  could anyone ever think that an outstanding feature of Miss

50

1   Hicks is the fact that she's tall.  I mean, she's, obviously,

2  not the person who passed the Debra Lee Burrell checks at the

3  stores in mass that are at issue in the West Mifflin Police

4  Department.  Or the one store.  It is the Shaw's Jewelry in

5  the Century II Mall.  I believe it's supposed to be Century

6  III Mall.

7      So, Miss Hicks is, obviously, not the person who

8  passes the Debra Burrell check at the Shaw's because there is

9  no way she is going to fit the description of exceptionally

10  tall and a huge ponytail.

11      So, all that shows you is more than one person

12  cashed or passed counterfeit checks that someone else is

13  making.  And the government, you know, under no stretch of

14  the imagination has proved by a preponderance of the evidence

15  that whoever it was passing the Eldora Harris checks was

16  working in concert with or jointly with Miss Hicks.

17      Indeed, when Miss Hicks was apprehended and brought

18  to the Wal-Mart store in Butler, where the store had reported

19  having suffered losses on checks under the name of Stacey

20  Childs, and Nevada Green, and Eldora Harris, the Wal-Mart

21  security personnel say, yes, we believe this person is Stacey

22  Childs and Nevada Green and also Yvette Middleton, but they

23  don't try and allege that Miss Hicks is Eldora Harris or has

24  any connection with the Eldora Harris checks.

25      And Detective Peerson of the Butler Township Police

51

1  Department, who is investigating the losses at the Wal-Mart

2  store, puts it in their report, they have not yet I-Ded the

3  person passing the Eldora Harris check.  Well, it simply says

4  there seems to be similarities how this occurred.  Therefore,

5  Miss Hicks had to be involved with the person passing them.

6      Does not pass any type of preponderance of the

7  evidence test.  And even if you would believe that Miss Hicks

8  was in the vicinity when these checks are passed, that

9  doesn't show she is working in concert with the person who

10  is passing them.  It just falls woefully short by proof by a

11  preponderance of the evidence.

12      I would ask you to try and put yourself in a

13  similar situation, where you have to use a preponderance of

14  the evidence standard.  I think sometimes, in criminal cases,

15  we get so focused beyond a reasonable doubt and how high that

16  standard is, when we get to sentencing, we are talking

17    preponderance of the evidence.  You kind of get a feeling,

18    well, as long as somebody will say something, that's a

19    preponderance of the evidence.

20          But if you were in a civil case and this is the

21    only case that a plaintiff put forth to prove their case, you

22    would grant summary judgment against them because you just

23    said this isn't enough.  If that's the best you can do, there

24    is no way that you can prevail.

25          As far as IDs are concerned, there is no evidence

52

1    that Miss Hicks produced any IDs from another ID.  And we've

2    pointed out in the objections that we filed with the

3    probation officer that he lays out in the addendum to

4    presentence report, in which the Probation Office agrees with

5    the focus of this Sentencing Guideline, was to stop what

6    Congress referred to as breeding of IDs, which was taking one

7    form of identification and creating a new form, going out and

8    using it to go get a new driver's license in someone else's

9    name.  That's not what you have here.

10          And there has to be a minimum of five of those.  I

11  don't think the government has proven that there were five.

12      As far as giving a sentence above what is called

13  for by the Sentencing Guidelines.  You know, some of this is

14  going to depend, Judge, on how you rule what the actual

15  offense level turns out being.

16      But, as we note in our position with respect to

17  sentencing factors, Section 4A1.3, which is part of the

18  Guidelines that talks about potential upward departures, it

19  states that an upward departure from defendant's criminal

20  history category would, perhaps, be appropriate if, A, for

21  previous offense was not counted or there was receipt of

22  prior consolidated sentences for ten years, for a series of

23  serious assaults, so that not all of them -- you haven't

24  gotten criminal history points for all of them in the past.

25  So, there might be some under-representation.  Or, if there

53

1  is a similar instance of large scale fraudulent misconduct.

2  Or, if there were a crime was committed while on bail,

3  pretrial release, for another serious offense.

4          And, also, the, the Guidelines say that it's

5    supposed to be, for an upward departure criminal history

6    category VI, when determining, determining whether an upward

7    departure, the Court should consider the nature of the prior

8    offenses rather than simply their number, because the nature

9    is often more indicative of a defendant's criminal record.

10         Now, obviously, Miss Hicks has a long record.  No

11   one could look at it and say differently.  But to denigrate

12   the sentences that are imposed by the state sentence, really,

13   I think, shows a bit of arrogance, trying to say, well, we

14   report no better what's going on in State court and you

15   should, basically, look at the sentences that were imposed by

16   the Court of Common Pleas judges and say that somehow those

17   judges didn't get it or are too lenient of a sentence.

18         I don't believe that that is an appropriate way to

19   approach this.  And to the extent of there is the argument

20   that Miss Hicks would be in criminal history category 14, if

21   the Guidelines were to carry out a further criminal history

22   category, you will note that as the criminal history

23   categories get bigger, they start with criminal history

24   category zero, 1, 2 is, 2 to 3, then 3, 4, 5 and 6 have three

25   criminal history point ranges.

54

1    If that were actually extrapolated farther, you

2    would end up having high crime rates, more than simply three.

3    For example, category VI, if you were going to put an outside

4    number on it, would be for 13, 14, 15, and 16.  And then, so

5    on.  Because, if you see that there is a pattern as you go

6    across from criminal history categories that show that each

7    criminal history category or a group of criminal history

8    categories starts incorporating more criminal history points,

9    that's what the Guidelines do with the loss calculations,

10   2D1.1 and the other Guidelines.  It takes it larger, larger.

11       As the amounts get bigger, that the, the ranges

12   start getting bigger exponentially.  I don't think this would

13   be a criminal history category 14 if you really tried to do

14   it that way.

15       I would submit the government has not met its

16   burden on amount of loss and that the probation officer be

17   corrected on, with regard to the two-level enhancement for

18   applying forms of identification.

19          THE COURT:  I am going to come down on side of

20   government on this.  I think the preponderance of the

21   evidence is beyond a reasonable doubt.  It really is

22   overwhelming.

23          I now want to talk to Mr. Conde for a few minutes.

24   We'll take a ten-minute break while I consult with Mr. Conde

25   in chambers.

                              55


1          THE DEPUTY CLERK:  All rise.  This Court is in

2    recess for ten minutes.

3          (Whereupon, a recess was had.)

4                     - - -

5          THE COURT:  Be seated, please.

6          After consultation with the probation officer and

7    consideration of the testimony that we've heard this morning,

8    or this afternoon, we find here that the appropriate offense

9    level is 10 and a criminal history category is VI.

10          Thus, the applicable guideline range is twenty-four

11   to thirty months' imprisonment; supervised release of two to

12   three years; a fine in the range of two to two thousand to

13   twenty thousand dollars; restitution in the amount of

14   $15,751.87.

15          At the same time, we note that the amount of the

16   loss here is $40,407.10 and a special assessment of one

17   thousand dollars, which is one hundred dollars each on ten

18   counts.

19          At this time, Mr. Patton, is there anything further

20   you wish to say?

21          MR. PATTON:   No, Your Honor.  But Miss Hicks would

22   like to make a statement, Your Honor.

23          THE COURT:  Okay.

24          THE DEFENDANT:  I would just like to say that I

25   have been incarcerated for two years, now.  I have worked

56

1    very hard to change my life in a positive direction.  And I

2    had no intentions on hurting anyone.  And I am rehabilitated.

3           I do have a family at home that needs me and I know

4    that I have changed my life, because I have a grandson that

5    needs me.  Guidance.  I don't want him to follow in the same

6   category that I have done.  I just would like to say, I'm

7   sorry.

8        MR. CONWAY:  I have nothing further to add, Your

9   Honor.

10       THE COURT:  Well, I think, I think, and I should

11   also add that I have received a letter from Miss Hicks, which

12   I have read.

13       I think maybe this is the worst criminal record I

14   have ever seen.  Not necessarily in terms of the severity of

15   the crime, but the number of crimes.  I think we've got

16   forty-two prior convictions here.  Eight where, for one

17   reason or the other, the charges were dropped.  And three,

18   and then three other arrests where, apparently, no charges

19   were made.

20       I think it may be the worst in terms of sheer

21   numbers that I have ever seen.

22       When you are taking money by deception, like this,

23   it's no different than reaching right into the merchant's

24   cash register and pulling it out, pulling out the cash.  And

25   the amount of money that's gone into the prosecution of Miss

57

1    Hicks, all these times, is, undoubtedly, in the millions of

2    dollars for the justice agencies have had to do, the police,

3    federal investigators, and so forth, that have had to deal

4    with her and with her crimes.  So, I can't be -- I can't be

5    lenient, despite what Miss Hicks says.

6        Mr. Patton, is there any reason sentence should not

7    be imposed at this time?

8        MR. PATTON:   No, sir.

9        THE COURT:  Miss Hicks?

10        THE DEFENDANT:  No.

11        THE COURT:  Mr. Conway?

12        MR. CONWAY:  No, Your Honor.

13        THE COURT:  After consulting the Sentencing

14    Guidelines, it is the judgment of Court that the defendant,

15    Melissa Hicks, is hereby committed to the custody of the

16    Bureau of Prisons to be imprisoned for a term of sixty

17    months.

18        It is further ordered that the defendant is to make

19    restitution in the amount of $15,751.87 to TeleCheck,

20    Attention:  Toni Sirlos, Case No. 2004-67-05-00016, 5251

21  Wesheimer, Houston, Texas 77056.

22      The defendant shall make restitution payments from

23  any wages she may earn in prison in accordance with the

24  Bureau of Prisons Financial Responsibility Program, through

25  which fifty percent of the defendant's salary shall be

58

1  applied to restitution.

2      Any restitution balance that is not paid in full at

3  the time of defendant's release from imprisonment shall be,

4  become a condition of supervision.

5      Waive the payment of interest in this case, due to

6  the defendant's financial situation.

7      The defendant shall notify the United States

8  Attorney for this district within thirty days of any change

9  of mailing or residence address that occurs while any portion

10  of the restitution remains unpaid.

11      Upon release from imprisonment, the defendant shall

12  be placed on supervised release for a term of three years.

13  This term consists of three years at each of Counts One

14  through Ten, with all such terms put to run concurrently.

15      Within seventy-two hours of the release from the

16   custody of the Bureau of Prisons, the defendant shall report

17   in person to the Probation Office to which the defendant is

18   released.

19      While on supervised release, the defendant shall

20   not commit another federal, state, or local crime.  Shall

21   comply with the standard conditions of supervision that have

22   been recommended by the Sentencing Commission and adopted by

23   this Court and shall also comply with the following

24   additional conditions.

25      The defendant shall not illegally possess a

59

1   controlled substance.

2      The defendant shall not possess a firearm or

3   destructive device.

4      The defendant shall pay any remaining restitution

5   through monthly installments of not less than ten percent of

6   her gross monthly income.  Defendant shall provide the

7   probation officer with access to any requested financial

8    information.

9    The defendant shall not incur new credit charges or

10   open additional lines of credit without the approval of the

11   probation officer.

12   The defense shall participate in a program of

13   testing and, if necessary, treatment for substance abuse, as

14   directed by the Probation Office, till such time as the

15   defendant is released from the program by a probation

16   officer.

17   The defendant shall submit to at least one drug

18   urinalysis within fifteen days of being placed on supervision

19   and at least two periodic tests thereafter.

20   The defendant shall participate in a mental health

21   treatment program as directed by the probation officer until

22   such time as defendant is released from the program by the

23   probation officer.

24   The defendant shall not use, purchase, or possess,

25   alcoholic beverages.

60

1    It is further ordered that the defendant shall pay

2   to the United States a special assessments of one thousand

3   dollars, which shall be paid to the U.S. District Court Clerk

4   forthwith.

5       We find that the defendant does not have the

6   ability to pay a fine.  The Court will waive the fine in

7   this case.

8       We believe the total sentence of sixty months,

9   followed by three years' supervised release, does adequately

10  address the nature and circumstances of this offense,

11  considering, particularly, the history and criminal

12  background of this defendant.

13      We realize that this is an upward departure from

14  the, from the guidelines.  We feel, certainly, it is in order

15  in this case.

16      I don't believe there are any charges to be

17  dismissed.  Any counts to be dismissed here, Mr. Conway?

18      MR. CONWAY:  That's correct, Your Honor.

19      THE COURT:  Court's adjourned.

20      Miss Hicks, you do have a right to appeal.  You

21  have ten days to file such appeal.  You are entitled to a

22  lawyer at every stage of the proceeding.

23          If you cannot afford an attorney, one will be

24   provided for you.

25          The DEPUTY CLERK:  All rise.  Court is adjourned.


                              61



1                    - - -

2          (Whereupon, the hearing was adjourned at 5:15 p.m.

3    on the twenty-second day of August, 2006.)

4                    - - -

5          C E R T I F I C A T E

6          I certify by my original signature herein that

7    the foregoing is a correct transcript from the record of

8    proceedings in the above-entitled matter.

9

10                    s/Sandra Wenger
                     Sandra Wenger
11                    Official Court Reporter

12
          *****NOT CERTIFIED WITHOUT ORIGINAL SIGNATURE*****
13

14

15

16

17

18

19

20

21

22

23

24

25